**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAMES R. ZAZZALI, as Trustee for the DBSI Estate Litigation Trust and as Trustee for the DBSI Private Actions Trust, | Civil Action No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| FOLEY & LARDNER LLP, JOHN DOES 1-50 and ABC ENTITIES 1-50, | **Demand for Jury Trial** |
| Defendants. | |

## INTRODUCTION

This action is brought by James R. Zazzali (the "Trustee"), the Bankruptcy Court-approved trustee for the DBSI Estate Litigation Trust ("Estate Litigation Trust") and the DBSI Private Actions Trust ("Private Actions Trust"), in his own name as the duly authorized representative to hold, manage and dispose of: (a) all claims and causes of action formerly owned by the bankruptcy estates of DBSI Inc. (formerly DBSI Housing Inc., and hereinafter "DBSI Inc.") and its direct and indirect debtor and Consolidated Non-Debtor[1] affiliates and subsidiaries (collectively, the "Debtors"), and (b) all claims and causes of action formerly owned by certain creditors and equity interest holders of the Debtors and their non-debtor affiliates and subsidiaries (collectively, the "DBSI Companies") who have assigned such claims to the Private Actions Trust. The Trustee brings this action against Foley & Lardner LLP ("Foley") for its role in a massive scheme of financial fraud. That fraud allowed the Debtors to be looted by their Insiders (as hereinafter defined), provided little to no benefit to the DBSI Companies, and bilked from Investors in the DBSI Companies hundreds of millions of dollars.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan (as defined herein).

**NATURE OF THIS ACTION**

1.      This action seeks to recover at least a portion of the hundreds of millions of dollars defrauded from investors in the Debtors ("Investors") in the debacle of the DBSI Companies.  In 2004, the DBSI Companies presented to the world the illusion of a monolith of wealth, competence and power.  Investors were told of substantial commercial real estate holdings throughout the country, of a history of successful and sophisticated real estate ventures, of assets into nine figures, and that no Investor had ever lost money on an investment in a DBSI Company.  Among other investment vehicles, the Insiders invited Investors, mostly owners of small, commercial real estate, to share in complex tax shelter transactions, and to purchase bonds, notes and equity interests in DBSI Companies engaged in major real estate development projects.

2.      Four years later, the world learned that this monolith was rotten to the core.  Obligations to Investors had outstripped receipts for years.  The edifice was supported by hundreds of empty or half-formed entities that passed assets back and forth to create the impression that it could keep its promises to Investors.  Assets were not as represented.  Positive cash flow came only from new Investor money, which was used to pay off old Investors, a classic Ponzi scheme.

3.      Most important for purposes of this Complaint, the Insiders, with the substantial aid and assistance of the DBSI Companies' lawyers, including Foley, began collecting and diverting Investor funds known as "Accountable Reserves," as hereinafter defined, funds that were supposed to be reserved for specific purposes.  Through the structure of the DBSI Companies' offerings -- including the creation of a complex master lease structure and other flawed investment structures and the drafting of misleading language with respect to the tax treatment of and uses to which the Accountable Reserves were to be put -- the Insiders, with the

knowing aid and assistance of Foley, were able to lure Investors into investment structures that were incapable of providing promised returns, to sell to Investors interests in real estate which were entirely illusory and to use over $80 million in Accountable Reserves for improper purposes, including misappropriation to the Insiders.  By way of its actions, described herein, Foley knowingly aided and assisted the Insiders in unlawfully looting tens of millions of dollars from the DBSI Companies and their unwitting Investors.  By way of its active involvement in the scheme to defraud, discussed herein, Foley injured the DBSI Companies and their Investors by increasing the liabilities of the DBSI Companies, decreasing their fair asset value and ultimately decreasing revenue.

4.       In November 2008, certain DBSI Companies filed voluntary petitions for relief under the Bankruptcy Code (as defined below).  Tens of thousands of Investors learned that they had lost everything.  The Bankruptcy Court docket is crowded with letters from individual Investors telling of lost savings accumulated in some cases through the effort of generations.  With this Complaint, the Trustee represents the victims of this fraudulent scheme -- to prevent the Insiders, and Foley as a key aider and abettor, from enjoying the fruits of their wrongdoing and to force a reckoning with them to make good the harm that they caused.

5.       This Complaint also seeks to avoid and recover from Foley, or from any other person or entity for whose benefit a particular transfer was made, all fraudulent and preferential transfers of property, to or for the benefit of Foley or Defendants John Does 1-50 or ABC Entities 1-50, from accounts owned by DBSI Inc., DBSI Realty Corporation ("Realty"), DBSI ST Tower LeaseCo LLC ("ST Tower"), DBSI Development Services LLC ("Development"), DBSI Telecom Office LLC ("Telecom"), DBSI 2007 Land Improvement & Development Fund LLC ("2007 LID" and collectively, the "Transferors") during the ninety day, two year and four

year periods prior to the filing of the Debtors' bankruptcy petitions pursuant to 11 U.S.C. §§ 544, 547, 548, 550 and 551 and/or applicable state law.

## NATURE OF PROCEEDING

6.      This action is brought to remedy Foley's conduct, which resulted in, *inter alia*, (i) professional negligence / legal malpractice; (ii) fraud; (iii) aiding and abetting breaches of fiduciary duty; (iv) aiding and abetting fraud; (v) civil conspiracy; and (vi) the payment of fraudulent transfers.

## PROCEDURAL HISTORY

7.      On November 6, 2008 (the "Petition Date"), One Executive Tower LLC, a DBSI Company and Delaware limited liability company, filed a voluntary petition for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). On various dates thereafter, multiple other Debtors, including but not limited to DBSI Inc., similarly filed voluntary petitions for relief in the Bankruptcy Court. Since the Petition Date, certain of these cases have been converted to chapter 7.

8.      On November 21, 2008, the Office of the United States Trustee for Region Three (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors.

9.      On April 3, 2009, the U.S. Trustee filed her Notice of Appointment of Examiner wherein she notified Joshua R. Hochberg (the "Examiner") of his appointment to serve as Examiner, pending approval of the Bankruptcy Court. On April 14, 2009, the Bankruptcy Court entered its Order Approving Appointment of Examiner [D.I. 3308]. The Examiner issued his First Interim Report on August 3, 2009 [D.I. 4159], and his Final Report on October 19, 2009 [D.I. 4544] ("Final Report").

10.     By Order dated August 14, 2009, the Bankruptcy Court directed the U.S. Trustee to appoint a chapter 11 trustee in the Debtors' jointly-administered chapter 11 cases.  By Notice of Appointment dated August 31, 2009 (the "Appointment Date"), the U.S. Trustee appointed the Trustee as the chapter 11 trustee in the Debtors' chapter 11 cases [D.I. 4327].  By Order dated September 11, 2009, the Bankruptcy Court approved the U.S. Trustee's appointment of the Trustee as the Chapter 11 trustee [D.I. 4375].

11.     By Order dated October 26, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order [D.I. 5924] (the "Confirmation Order"), confirming the *Second Amended Joint Chapter 11 Plan of Liquidation Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [D.I. 5699] (the "Plan"), in the chapter 11 cases and proceedings of the Debtors.  The Plan substantively consolidated the estates of the Debtors and Consolidated Non-Debtors *nunc pro tunc* to November 10, 2008.  The Plan also created four trusts including: the Estate Litigation Trust and the Private Actions Trust.  On October 29, 2010, the effective date of the Plan, the claims and causes of action held by the Debtors' estates were transferred to the Estate Litigation Trust.  Thereafter, certain creditors and equity interest holders of the DBSI Companies assigned their individual claims to the Private Actions Trust in exchange for beneficial interests therein.  Those Investors who, pursuant to the Plan, Confirmation Order and Private Actions Trust Agreement, have assigned their claims against Foley to the Private Actions Trust will be referred to as "Assigning Investors."

## PARTIES

12.     Plaintiff James R. Zazzali is the court-approved litigation trustee of the Estate Litigation Trust and the Private Actions Trust.  Plaintiff is an individual who is a citizen and domiciliary of the State of New Jersey.

13.     Defendant Foley is a Wisconsin Limited Liability Partnership with its principal place of business in Milwaukee, Wisconsin.

14.     Defendants John Doe 1-50 and ABC Entities 1-50 are fictitious names representing one or more persons, corporations or other entities for whose benefit Foley received the transfers at issue in this Complaint and/or are the immediate or mediate transferee(s) of the initial transfer(s) at issue in this Complaint.

## JURISDICTION AND VENUE

15.     Pursuant to the Confirmation Order, the Bankruptcy Court expressly retained jurisdiction over "all matters arising under, arising out of, or related to, [Debtors'] Chapter 11 Cases and the Plan, to the fullest extent permitted by law," including jurisdiction "to hear and determine all Causes of Action by or on behalf of . . . the DBSI Litigation Trustee, and the Private Actions Trustee."

16.     This Court thus has original jurisdiction over these bankruptcy matters pursuant to 28 U.S.C. § 1334(b).  Nevertheless, despite the general order of reference to the Bankruptcy Court, because there are additional bases for this Court's jurisdiction, as set forth below, and because Plaintiff seeks trial by jury, in an abundance of caution, Plaintiff brings this action in the District Court in the first instance.

17.     This Court also has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

18.     This Court has jurisdiction over the Trustee's claims for violations of federal securities laws under 15 U.S.C. §§ 78aa and 78j.

19.     This Court has supplemental jurisdiction over the Trustee's state law claims under 28 U.S.C. § 1367(a).

20.     This Court also has jurisdiction under 28 U.S.C. § 1332.  There is complete diversity of citizenship and the amount in controversy exceeds $75,000.

21.     Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1391, and 28 U.S.C. §§ 1408 and 1409(a).

22.     The fraud in which Foley was complicit and out of which the causes of action in this Complaint arise hinged upon the systematic utilization of Delaware law.  Approximately 2,500 special purpose entities -- over 95% of the special purpose entities through which the fraud alleged in this Complaint was perpetrated -- were formed in Delaware.  The formation of those entities in Delaware was critical to securing the financing necessary to perpetrate the fraud. Some of the DBSI Companies for which Foley provided legal services were Delaware companies and some victims of the fraud in which Foley was complicit, and who received materially misleading statements reviewed and/or drafted by Foley, are Delaware residents.  As a result, this Court has personal jurisdiction over Foley and venue in Delaware is appropriate.

## FACTUAL BACKGROUND

### A.     The Fraud

#### (1)     Overview

23.     The operation that is the subject of this Complaint was a sprawling, fraudulent real estate investment empire, involving hundreds of corporations and properties, but controlled by Douglas Swenson, with the substantial aid of a cadre of insiders including, among others, Charles Hassard, John M. Mayeron, Walter E. Mott, Thomas Var Reeve, Gary Bringhurst, Jeremy Swenson, and David Swenson (collectively, the "Insiders").

24.     Whatever the Insiders' original business plan may have been, for many years the DBSI Companies had come loose from and operated unattached from any rational economic moorings, and ultimately became nothing more than an elaborate "Ponzi" scheme to defraud Investors.  For as many as six years before the Debtors' Chapter 11 filings took place, the DBSI Companies had been rapidly losing vast sums of money.  Very substantial obligations to

Investors were met by raising new money from new Investors, who were repaid with money bilked from yet newer Investors. New real estate inventory was constantly needed to create vehicles for these new investments. The Insiders, meanwhile, paid themselves handsomely with other people's money and appropriated valuable tax advantages to themselves. Corporate formalities as to the separateness of the DBSI Companies were routinely disregarded or nonexistent; cash, assets and liabilities were shifted among them without regard for actual ownership or equivalent value; funds were commingled with impunity. Financial reports and accounting records were manipulated and fabricated to obscure the fraudulent activity and to create for current and prospective Investors an illusion of financial health. The entire organization was a fraud on Investors.

25.     By 2004, the Insiders had caused the DBSI Companies to become a Ponzi scheme, in which the guaranteed returns to older deceived Investors could only be satisfied by the flow of funds from the newly deceived Investors.

26.     By 2005, the Insiders were largely dependent on new investor money to provide cash for the DBSI Companies' operations and to fund payments to prior Investors.

27.     By 2007, the cash demands of operations and required payments to Investors had become even more significant: the DBSI Companies' property portfolio was losing approximately $3 million per month.

28.     The largest expenses contributing to these losses were tenant-in-common ("TIC") Investor payments, discussed in further detail below, which, by fourth quarter 2008, totaled $25 million per quarter.

29.     The impending, inevitable collapse of the enterprise notwithstanding, throughout this period, the Insiders misappropriated the funds of the DBSI Companies and the Investors by

taking substantial insider payments -- totaling approximately $75 million -- while also using loans to failing technology companies as a handsome tax shelter.

30.     Approximately $500 million was raised from the Insiders' funding programs. Even as the Petition Date approached, the Insiders were planning to raise up to $30 million more in additional debt, to rob yet another Peter to pay Paul.

**(2)     The TIC Syndication Business**

31.     Section 1031 of the Internal Revenue Code permits owners of real estate to defer recognition of the gain they might have in their real property when it is sold if the proceeds are used to purchase a similar or "like-kind" property within a certain time.  26 U.S.C. § 1031.  In 2002, the I.R.S. ruled that the like-kind property may be a TIC interest in the new property, provided the TIC interest is of equivalent value.  Rev. Proc. 2002-22 (I.R.S. 2002).  This permitted 1031 exchange syndicators to sell numerous TIC interests in large real estate properties to Investors with gains from smaller properties.

32.     Following the I.R.S. ruling in 2002, the Insiders became major syndicators of 1031 exchange or "TIC" properties.

33.     While, to the best of the Trustee's knowledge and information, to date, there has been no binding judicial determination as to whether TIC interests constitute securities, upon information and belief, as a legal matter, the TIC interests sold by the Insiders constitute securities.  In March of 2005 the National Association of Securities Dealers issued a notice to members which provided that "[i]n a TIC exchange, interests in real property are exchanged for instruments that generally are securities for purposes of the federal securities laws and NASD rules" (citing <u>SEC v. Edwards</u>, 540 U.S. 389 (2004); <u>Triple Net Leasing, LLC</u>, SEC No-Action Letter, SEC No-Act. LEXIS 824 (Aug. 23, 2000)).

34.     Much of the Insiders' syndication of TIC properties was conducted through FOR 1031, an Idaho limited liability company that was controlled and managed by the Insiders and later, DBSI Inc.

35.     FOR 1031 was formed in August 2003 for the purpose of acquiring and syndicating real estate to TIC Investors in the form of real estate.

36.     Since its formation, FOR 1031 was managed and controlled by Douglas Swenson, Thomas Var Reeve, and/or Gary Bringhurst.

37.     To lure purchasers, FOR 1031 -- *i.e.* Douglas Swenson and Thomas Var Reeve -- guaranteed rent proceeds through a master lease structure.  Under this structure, the TIC purchasers leased their properties to a DBSI Company master lessor, often times DBSI Inc. or DBSI Master Leaseco ("Master Leaseco"), in exchange for, among other things, a guaranteed return on their investments in the form of rent payments.  The master lessor then sublet the property to sub-tenants in an effort to generate profits.

38.     However, the guaranteed investment return was not provided by FOR 1031, but by another DBSI entity -- initially DBSI Inc. and later Master Leaseco, an entity formed and capitalized for the specific purpose of demonstrating to lenders and Investors that there was a financially sound master tenant for each TIC property.

39.     Master Leaseco bore the expenses associated with capital improvements and tenant improvements on TIC properties.  It was also obligated to bear the losses associated with rent shortfalls.  In short, DBSI Inc., vis-à-vis Master Leaseco, bore, in full, whatever losses the TIC properties might suffer under the master lease structure.

40.     The risks and liabilities borne by DBSI Inc. were substantial because the real estate assets purchased by FOR 1031 and its subsidiaries were substandard, incapable of producing reliable revenue, financially insecure and generally "toxic."

41.     In exchange for DBSI Inc.'s substantial acceptance of risks and liabilities, FOR 1031 paid DBSI Inc. a "fee" for its role as master lessee and guarantor.  But that fee was woefully inadequate in relation to the scope of the liabilities being transferred.

42.     The agreements by and among DBSI Inc., Master Leaseco, and FOR 1031 constituting the master lease structure were not at arm's length and were not market-based.  In other words, no reasonable third-party would have agreed to assume the guaranty liability and other obligations that DBSI Inc. assumed for the benefit of FOR 1031's TIC syndication business.

43.     With DBSI Inc. bearing FOR 1031's financial risks and liabilities, the Insiders were able to prepare fraudulent financial statements for FOR 1031 designed to mislead Investors into believing that FOR 1031 was financially strong.  In reality, because the master lease structure effectively transferred FOR 1031's liabilities "off balance sheet" to DBSI Inc. without adequate consideration, the financial figures used by the Insiders to demonstrate FOR 1031's financial health were both fiction and illusion.  FOR 1031 was hopelessly insolvent, beginning no later than late 2004.

44.     The master lease structure was a substantial component of the Insiders' fraud.  Even though the structure was inherently flawed and doomed to fail from inception, it was attractive to Investors because of the tax benefits provided under Section 1031; the steady stream of income guaranteed by DBSI Inc., purportedly consisting of rent payments from the TIC properties' commercial tenants; and the Insiders' false representations that DBSI Inc. had the

financial wherewithal to make good on its guarantees and to fulfill all master lease obligations of both FOR 1031 and the master lessees should it be necessary. The attractiveness of those guarantees -- although, in reality, worthless -- enabled the Insiders to price TIC interests at sums that exceeded, in some cases substantially, the market value of the underlying property.

### (3)   The Accountable Reserves

45.   Another way in which the Insiders made TIC offerings attractive to Investors was to tout the DBSI Companies' "responsibility" to maintain and/or improve the properties.

46.   In 2005, the Insiders began routinely designating no less than five percent of the funds from Investors at closing, purportedly setting aside those funds to pay costs and expenses in connection with the asset over the term of the master lease ("Accountable Reserves").

47.   Pursuant to the Private Placement Memoranda (the "PPMs") and other offering materials issued by the Insiders with respect to TIC offerings (collectively, "Offering Materials"), the specified, authorized uses of Accountable Reserves funds included, *inter alia*, tenant improvements, leasing commissions, capital improvements for improved real estate, management fees, taxes, insurance and other related fees for unimproved real estate.

48.   As a condition of investing, Investors were required to certify that they had read and relied upon the PPM for the offering.

49.   After August 15, 2005, Accountable Reserves were collected in connection with almost every real estate project sold through the DBSI Companies.

50.   Investors were assured that the collection of Accountable Reserves would ensure that the TIC property would be properly maintained over the course of the master lease without the risk of Investors being required to invest additional funds for improvement or maintenance of

the assets and were assured through the PPMs that the Accountable Reserves would not be commingled with funds from any other source.

51.    Those statements were knowing, material, false misstatements.

52.    In contrast with those statements, the Accountable Reserves funds were commingled with other DBSI Inc. funds and used by the Insiders to make distributions to themselves and to satisfy whatever cash needs the DBSI Companies might have at any particular moment, including servicing the debt of earlier Investors.

53.    The normal practice of TIC property ownership structures and the use of reserves held by a third-party master leasee, in conjunction with the statements in the PPMs and the use of the term "Accountable Reserves," led Investors to believe that the Accountable Reserves would be kept as a separate and secure fund of money either to be used as permitted under the PPMs or returned to the Investors to the extent unused.

54.    In further support of the fiction that Accountable Reserves would be escrowed and used only for the purposes stated in the PPMs, the Insiders disseminated to Investors tax opinion letters, many of which, as discussed in further detail below, were drafted by Foley, advising them that any funds that could not be considered part of the purchase price of a TIC interest might be considered "taxable boot" to the Investors.  Those letters were distributed along with PPMs stating that the Accountable Reserves would be used for purposes unrelated to the purchase of the TIC interest.  In addition, the Insiders sent annual letters to Investors reiterating that Accountable Reserves should be treated separate and apart from the purchase price of TIC interests.

55.    In sum, the Insiders, by their repeated assertions as to the approved uses for Accountable Reserves and that Investors should not consider Accountable Reserves as part of the

purchase price for their investments, and by disseminating to Investors a tax opinion letter

advising them that any money not considered part of the purchase price for their investments

would likely be considered taxable gain by the IRS, intended to cause and did cause Investors to

wrongly believe that the Accountable Reserves would be held separate from other funds

collected from Investors and that the Accountable Reserves would be used only for the purposes

permitted under the express terms of the PPMs.

56.     The Insiders collected nearly $100 million in Accountable Reserves through the

use of these misstatements.

57.     Only approximately $18 million of the Accountable Reserves were used by the

Insiders to pay expenses authorized under the PPMs.

58.     Accordingly, approximately $82 million of Accountable Reserves were spent for

unauthorized purposes, including, misappropriation by the Insiders.

59.     What's more, instead of escrowing the Accountable Reserves, the Insiders

reported the Accountable Reserves as liabilities on the DBSI Companies' financial statements

and tax returns.  Those liabilities were then reduced over time as monies were spent on leasing

commissions, tenant improvements and/or capital expenses.  The Insiders did not report the

Accountable Reserves as income of the DBSI Companies.  In other words, the Insiders looted the

Accountable Reserves and put them to whatever other uses they saw fit while, at the same time,

treating those funds, for tax purposes, as if they had been put only to the uses allowable under the

express terms of the PPMs.

**B.     Foley's Conduct**

    **(1)     Foley Becomes Involved With the DBSI Companies**

60.     Foley's professional relationship with the DBSI Companies began at least as early as 2004 and included, without limitation, advising the DBSI Companies in connection with the sale of a parcel of property known as "Southtrust Tower" and, in May 2005, reviewing for the DBSI Companies a PPM for the sale of TIC interests in a property in Florida known as "Baymeadows."

61.     In the years that followed, the DBSI Companies engaged Foley to provide its legal services with increasing frequency.  Foley's increase in engagements was largely owing to the efforts of Foley attorney Stephen I. Burr ("Burr") who devoted a substantial amount of effort in securing for Foley additional business from the DBSI Companies and expanding the scope of his professional relationship with the DBSI Companies and the Insiders on behalf of both Foley and himself.

62.     By the end of 2007, Foley was intimately involved with the DBSI Companies and their real estate offerings and had provided services for the DBSI Companies including, without limitation, reviewing and revising and/or drafting TIC offering PPMs; advising the DBSI Companies on tax issues relating to TIC offerings, including the tax treatment of Accountable Reserves; authoring many of the above-discussed tax opinion letters that the Insiders disseminated to Investors in connection with TIC offerings; reviewing real estate purchase contracts; reviewing financing agreements in connection with real estate purchases; conducting due diligence in connection with real estate purchases; advising on easement and zoning issues; and advising on ERISA issues.

63.     From 2006 through 2008, Foley acted as tax counsel for and issued tax opinion letters in connection with at least fifty-four TIC offerings.  A chart identifying the offerings in

connection with which Foley acted as tax counsel and issued tax opinion letters is attached hereto as Exhibit A.

64.     Upon information and belief, Foley reviewed the PPMs for at least the following DBSI Companies' offerings: DBSI Beacon Point LLC; DBSI Buckley & 120th LLC; DBSI Hernando South LLC; DBSI Hernando South II LLC; DBSI Shops at Turkey Creek LLC; DBSI Green Street Commons LLC; DBSI New Hampstead LLC; DBSI New Hampstead II LLC; DBSI Houston Levee Galleria LLC; DBSI West Boise LLC; DBSI Pinehurst Square East Acquisition LLC; DBSI Pinehurst Square West Acquisition LLC; DBSI Florissant Market Acquisition LLC; DBSI Belton Town Center Acquisition LLC; DBSI Snake River Valley LLC; DBSI Currell Centre LLC.

65.     In addition, upon information and belief, Foley not only reviewed but drafted portions, if not all of, the PPMs for DBSI Cavanaugh LLC; DBSI Cavanaugh II LLC; DBSI Cavanaugh III LLC; and DBSI Cavanaugh IV LLC.

66.     During this same time, Foley devised inherently flawed investment structures for the Insiders, which enabled the Insiders to continue to raise new investor money to pay themselves, to pay maturing obligations to old Investors and to pay other obligations as they became due.

67.     As discussed in further detail below, in performing the above-listed services for the DBSI Companies and Insiders, Foley authored, created and/or advised on several mechanisms by which the Debtors and Assigning Investors were defrauded.

**(2)     Foley Devises Flawed Investment Structures Enabling the Insiders to Perpetuate Their Fraudulent Scheme**

68.     Even at the large mark-up the Insiders charged Investors for TIC interests, the TIC business generated little real profit.  In fact, Foley and the Insiders knew that the business

plan could not sustain viability.  It was obvious to any competent professional that the rate of return the DBSI Companies promised to Investors could not be met in light of, among other things, the value of the properties underlying the investments, the costs the DBSI Companies were incurring in offering the investments and the prevailing capitalization rate for similar investments at that time.  As a result, the Insiders were forced to, among other things, move increasingly large volumes of real estate through their TIC syndication and master lease structure, saddling the DBSI Companies with ever-growing and recurring liabilities.

69.     With the increased volume of sales came an increasing number of Investors who were owed a guaranteed rate of return on their respective investments.  At the same time, however, the shortfall between the rental income generated by existing TIC properties and DBSI Inc.'s payment obligations to TIC Investors was growing at an exponential rate.

70.     Also during this time, the DBSI Companies' overhead increased to accommodate the increased workload from additional TIC syndications while the Insiders' investments in technology and residential real estate companies further drained cash from the DBSI Companies.

71.     As a result of this confluence of factors, the Insiders' TIC syndication business was losing money from 2004 onward and, by and after 2006, cash shortages became chronic and severe.

72.     Accordingly, the Insiders became desperate for additional "product" (i.e., commercial real estate) to purchase and syndicate in order to meet their existing obligations to prior Investors.  Indeed, the Insiders became so desperate for additional product that they were willing to have the DBSI Companies purchase unprofitable real estate at unjustified above-market prices just to continue the cash stream generated by selling TIC interests to new Investors.

73.     By the summer of 2007, notwithstanding the artificially inflated prices the Insiders were willing to pay for property, the pool of commercially developed parcels of real estate that the DBSI Companies could purchase and syndicate began to run dry. As a result, the Insiders turned to Foley to develop for the Insiders a structure through which they could purchase and syndicate undeveloped parcels of real estate.

74.     Upon information and belief, before the Insiders could sell TIC interests in undeveloped parcels of real estate, they needed to devise a way to make TIC interests in those properties appealing to Investors. In contrast with commercially developed properties, undeveloped parcels of real estate could not generate rent from commercial tenants, meaning that the Insiders could not guarantee Investors in those properties the steady stream of income from rent payments that the Insiders guaranteed Investors in commercially developed TIC properties.

75.     Upon information and belief, absent a guaranteed income stream, the Insiders could not have justified the inflated prices they needed to charge TIC Investors in order to keep their fraudulent scheme afloat. The Insiders engaged Foley to help them resolve this problem, tasking Foley to develop a structure by which the Insiders could guarantee a steady stream of payments to holders of TIC interests in undeveloped parcels of real estate even though those properties could not generate rental income from commercial tenants.

76.     Burr, eager to increase Foley's book of DBSI Companies' business, and to further ingratiate himself with the Insiders, devised for the DBSI Companies a "land option" structure. Under this structure, the Insiders would sell TIC interests in undeveloped properties. In lieu of a stream of rental payments, the Insiders guaranteed Investors in the undeveloped properties regular payments in exchange for the option to buy back the property from the Investors for premium pricing at future dates.

77.     Instead of guaranteeing a steady stream of payments based on a property's ability to produce rental income, under Foley's land option structure Investors were guaranteed a stream of payments based on the properties' expected increase in value and DBSI Inc.'s right to repurchase the TIC interest at a later date.

78.     Much like the structure through which TIC interests in commercially developed properties were sold, however, Foley's land option structure was inherently flawed.  The land option TIC interests were doomed to fail because covering the option payments guaranteed to Investors required either an entirely unrealistic rise in the value of the underlying property or an enormous source of inexpensive, long-term working capital, which the DBSI Companies plainly did not possess.

79.     In sum, the only thing Foley accomplished through its land option structure was to provide the Insiders with another means by which to incur obligations to new Investors that could be satisfied only from the proceeds of yet additional investment offerings.  As a result, Foley's land option structure constituted a fraud on both the Debtors and the Assigning Investors.

**(3)     The Cavanaugh Offerings**

80.     One of the properties the Insiders syndicated pursuant to Foley's hopelessly flawed land option structure was an undeveloped parcel of real estate known as the "Cavanaugh" property.  The Cavanaugh property is a 177.91 acre parcel of real estate a DBSI Company affiliate purchased in early 2007 for $28 million.

81.     Although Foley's land option structure provided a mechanism through which interests in the Cavanaugh parcel could be marketed to Investors, zoning restrictions prevented the property from being divided and, as a result, prevented the Insiders from selling fee simple

TIC interests in the property.  The Insiders tasked Foley with devising a way to overcome this obstacle by creating a structure through which the Insiders could sell fractional interests in a single, undivided parcel of real estate.

82.     In answer to the Insiders' request, in July 2007, Burr, on behalf of Foley, devised and recommended that the Insiders use a ground lease structure whereby a DBSI special purpose entity would lease a portion of the Cavanaugh parcel from the DBSI Company that owned it. Under Foley's structure, that DBSI special purpose entity would then sell interests in the ground lease.

83.     The Foley ground lease structure was nothing more than an artifice of fraud.

84.     First, Investors in the Cavanaugh ground lease would not actually own a fee simple interest in any portion of the Cavanaugh property.  This meant that, in the event DBSI Inc. defaulted on its option payment obligations under the land option structure, the ground lease Investors would have no direct recourse in the property purportedly securing their investment.

85.     Foley attempted to address the lack of security for Investors by building into its ground lease structure an option for the TIC Investors, upon default by DBSI Inc., to purchase for $1 the property purportedly securing their investment, but Foley expressly admitted that those options would be invalid as a result of the zoning restrictions preventing the division of the property.  As a result, Investors were made to believe they had rights to purchase interests in land that were in fact entirely illusory.

86.     Second, because the Cavanaugh property was non-divisible, each Investor would be subject to liabilities incurred by the property as a single undivided parcel.  For example, each Investor might be liable for taxes imposed on the property as a whole, notwithstanding that the Investor had purchased only a fractional interest in the ground lease.

87.     In a memo dated July 31, 2007 -- the same memo through which Foley recommended the use of the ground lease structure -- Burr expressly recognized several of the structure's inherent flaws.  For example, Burr wrote:

> A fundamental issue is what is the option, i.e. an option to acquire a non-legal part of a larger parcel may be problematic.  The assumption would be that all options would have to be exercised together.
>
> What are the risks to investors in investing in a leasehold, and then in a leasehold on a non-legally separated parcel?  Once example would be exposure to property taxes on the larger parcel.

88.     Although Foley recognized in writing, months before the Cavanaugh property was ever marketed to Investors, critical flaws in its ground lease, upon information and belief, Foley proceeded to draft the PPMs (or portions thereof) through which interests in the Cavanaugh properties were marketed to Investors and to review the PPMs for accuracy.  None of those PPMs made a disclosure of the flaws in Foley's ground lease structure that was reasonably calculated to adequately inform investors of the insurmountable problems associated with the structure.

89.     By use of these misleading PPMs and Foley's inherently flawed land option and ground lease structures, the Insiders were able to raise over $14.3 million in investments in the Cavanaugh property.  The fact that Foley, upon information and belief, drafted and reviewed PPMs for the Cavanaugh offerings that failed to disclose to Investors material and severely disadvantageous characteristics of the investments which Foley itself devised not only constitutes fraud by Foley, but creates a strong inference that Foley was a knowing participant in the Insiders' scheme to defraud thousands of unwitting Investors.

**(4)     Foley Drafts and/or Reviews Misleading PPMs, Provides Tax Advice and Authors Tax Opinion Letters Used to Defraud Investors**

90.     The PPMs for the DBSI Companies' TIC offerings contained numerous additional misrepresentations to induce Investors to purchase the investments on offer, including misrepresentations regarding the financial strength of the DBSI Companies, their history and experience in managing successful real estate ventures, and the intended use of funds.

91.     Statements made to Investors through PPMs reviewed and/or drafted by Foley deliberately and falsely inflated DBSI Inc.'s net worth.

92.     For example, the PPMs for the Cavanaugh offerings stated that "DBSI Housing [Inc.] has a net worth of more than $105 million" and DBSI Inc. had "an unaudited net worth of more than $100 million."

93.     In addition, the PPMs drafted and/or reviewed by Foley contained the above-discussed fraudulent and misleading language concerning the nature and permissible uses of Accountable Reserves.

94.     Indeed, upon information and belief, the portions of the Cavanaugh PPMs drafted by Foley included a key change to the language through which the Insiders asserted to Investors that Accountable Reserves would not be commingled with funds from any other source.  That language, as amended by Foley for the Cavanaugh PPMs, was included in the PPMs for subsequent TIC offerings.

95.     Upon information and belief, Foley knew that its statement that Accountable Reserves would not be commingled with funds from other sources was false, knew that statement would be disseminated to Investors, and knew that the Insiders likely would continue to use Foley's fraudulent and misleading statement in future PPMs.  As a result, each issuance of a PPM that contained Foley's misrepresentation constitutes an additional act of fraud by Foley and/or aiding and abetting fraud by Foley.

96.     In addition to drafting and/or reviewing misleading PPMs, Foley also provided the Insiders with tax advice and issued tax opinion letters in connection with approximately fifty TIC offerings.

97.     Many if not all of the PPMs for the offerings in connection with which Foley provided tax advice and issued tax opinion letters included the above-discussed, materially misleading statements regarding the nature and permissible uses of Accountable Reserves.

98.     In its tax opinion letters, Foley advised Investors that any money Investors paid in connection with their TIC interests that could not be considered part of the purchase price for those TIC interests might be treated as taxable gain by the IRS.  Thus, although the PPMs explicitly stated that the DBSI Companies were not offering any opinion as to the appropriate tax treatment of the Accountable reserves, read together, the PPMs and Foley's tax opinion letters advised Investors that Accountable Reserves funds should be considered taxable boot. Consistent with that representation, upon information and belief, Foley advised the Insiders that they could treat Accountable Reserves funds as liabilities on the DBSI Companies' tax returns.

99.     However, upon information and belief, Foley knew that the Insiders did not and never intended to segregate Accountable Reserves funds and that the Insiders applied those funds in manners unauthorized by the PPMs.

100.    As a result, upon information and belief, Foley knew that its statements and the DBSI Companies' statements regarding the tax status of the Accountable Reserves would mislead and did mislead Investors by causing them to believe that the Accountable Reserves would be kept separate, used only as permitted under the PPMs, and returned to the Investors to the extent unused.

101.     Upon information and belief, Foley intended that Investors would rely on the misstatements it drafted and/or reviewed and Investors did reasonably rely on those statements to their detriment.

102.     The fraudulent nature of these and all misstatements that Foley drafted and/or reviewed, due to the concealment of the Insiders and Foley, could not have been known to the Assigning Investors until the issuance of at least the Interim Report of the Bankruptcy Examiner on August 3, 2009.

103.     By drafting and reviewing misleading PPMs, authoring misleading tax opinion letters and providing advice and counsel as to the tax consequences of the Accountable Reserves, Foley became intimately involved with and an active and knowing participant in the Insiders' fraudulent scheme.

### (5)     Foley Actively Solicits Investors in the DBSI Companies' Offerings

104.     By the beginning of 2008, Burr had become a virtual member of the DBSI Companies' control group, receiving responsibilities that included working directly with former DBSI Company Vice President of Finance and Accounting Matt Duckett on a third-party financing structure designed to circumvent the investor limits applicable to TIC structures.

105.     Upon information and belief, by the beginning of 2008, as a result of the extensive work and involvement by Foley and Burr in the DBSI Companies' affairs and offerings, Foley was aware that the DBSI Companies' PPMs, read in conjunction with Foley's tax opinion letters, were materially misleading and that the Insiders' TIC syndication business was a fraud.

106.     That knowledge notwithstanding, by the spring of 2008, in an effort to ingratiate himself even further with the Insiders, Burr, on Foley's behalf, was actively encouraging Foley's

clients to invest in various DBSI Companies' offerings.  Around this same time, Burr also began encouraging lenders to develop relationships with the DBSI Companies.

107.    In addition, other Foley attorneys participated in one or more seminars alongside DBSI Insiders held for the purpose of promoting the DBSI Companies' offerings.

108.    Burr continued to encourage Foley's clients to invest in the DBSI Companies' offerings even after some of Foley's clients expressed concern about the financial stability of the DBSI Companies and the viability of the investments.  Indeed, Burr continued to reassure Foley's clients that the DBSI Companies were financially stable and that their investments offerings were sound, even on the eve of the DBSI Companies' bankruptcy filings.

109.    Throughout this time, Burr took steps to make sure that the Insiders recognized the efforts he had been making on their behalf and to ensure that he and Foley received credit for their efforts in order to procure more DBSI work.

110.    By taking the steps alleged herein, Burr and Foley became even more direct and knowing participants in the Insiders' fraud against Investors, including Foley's own clients.

## C.    **The Preferential and Fraudulent Transfers**

111.    During the two year period before the Petition Date, that is, November 10, 2006 through and including November 10, 2008 (the "Two Year Period"), the Transferors made one or more transfers of an interest in the Debtors' property to, or for the benefit of, Defendants (the "Two Year Transfers").  A schedule identifying each Two Year Transfer, including the identity of the Transferor, is attached hereto as Exhibit B and is incorporated herein by reference.

112.    During the four year period before the Petition Date, that is, from November 10, 2004 through and including November 10, 2008 (the "Four Year Period"), the Transferors made one or more transfers of an interest in the Debtors' property to, or for the benefit of, Defendants

(the "Four Year Transfers").  A schedule identifying each Four Year Transfer, including the identity of the Transferor, is also included in Exhibit B and is incorporated herein by reference.

113.    At the end of September 2008, the Debtors ceased making (i) all TIC rent payments under numerous master leases, and (ii) all interest payments due Investors in certain of the Debtors' note and bond funds.  This freed up approximately $10 million in cash for the months of October and November 2008 and facilitated the Debtors' ability to make payments to certain preferred creditors during the ninety days prior to the Petition Date ("Preference Period"). During the Preference Period, Realty made one or more transfers of an interest in the Debtors' property to, or for the benefit of, Defendants (the "Preferential Transfers").  A schedule identifying each Preferential Transfer is also included in Exhibit B and is incorporated herein by reference.

114.    The Debtors and other DBSI Companies were insolvent using traditional accounting standards and tests.

115.    The Debtors and other DBSI Companies were also insolvent as a matter of law by virtue of their fraudulent scheme.

**(1)    DBSI Inc. Was Insolvent**

116.    DBSI Inc. was insolvent at the times it made the transfers identified on Exhibit B and at other times.

117.    The Insiders were able to mask the insolvency of the Debtors and other DBSI Companies, including DBSI Inc., on their unaudited consolidated balance sheets during the Four Year Period by failing to follow Generally Accepted Accounting Principles ("GAAP").

118.   By failing to follow GAAP, the Insiders issued materially inaccurate financial statements during the Four Year Period that permitted the Debtors and certain DBSI Companies, including DBSI Inc., to conceal their insolvency from the investing public.

119.   During the Four Year Period:

(a)   DBSI Inc. disbursed funds on a monthly basis to support TIC properties that were failing to generate sufficient operating income to satisfy their rent and loan obligations to TIC Investors.  In short, DBSI Inc.'s guarantees of the master lessees' obligations were no longer contingent.  DBSI Inc. was covering all of the TIC properties' cash shortfalls.

(b)   DBSI Inc. also guaranteed the repayment of principal and interest in the amount of approximately $300,000,000 in bond and note issuances.  This guaranty liability was not fully recognized, recorded or disclosed by DBSI Inc. in its financial statements.

(c)   DBSI Inc. posted receivables due from its affiliates at full value without testing those receivables for impairment, even though many of the borrowing affiliates were known to be insolvent and known to be unable to repay the amounts due.  DBSI Inc. should have -- but failed to -- establish off-setting reserves for the value of the impaired receivables due from its affiliates.

(d)   DBSI Inc. made no effort to accurately reflect the near total impairment of its investments in DBSI Inc.'s technology subsidiaries, which as recently as June 30, 2008, DBSI Inc. carried on its books and records at $235,000,000.

(e)   The Examiner found that DBSI Inc.'s financial statements were misleading because they netted as a single line item receivables due from, and payables due to, affiliated entities, including the bond and note entities.  According to the Examiner:

> DBSI Inc.'s balance sheet for the period ended December 31, 2007 presented, under current assets, a "Net receivable from affiliates"

of $1.4 million and nothing for liabilities owed to the bond and note holders. Yet, the amount due at that time to the bond and note holders was approximately $194 million.

The netting of receivables and payables was misleading because the payables and receivables being netted were two very different things. The payables consisted of hard debt owed to bond and note holders with a defined maturity date. On the other hand, the receivables from the Technology Companies were likely uncollectible debts that neither Stellar nor the Technology Companies could pay off.

(f)     DBSI Inc. carried long-term assets and inventory (real property) at cost, without regard to realizable market value and without establishing off-setting reserves to account for the difference between cost and market value or writing down the reduced value of the asset as a loss. Notably, this was done at a time when real estate values were declining.

120.    The Insiders' management of the DBSI Companies' bank account structure also evidences a business that was hopelessly insolvent.

121.    Throughout its history, the DBSI Companies maintained hundreds of bank accounts. The accounts were designated for various purposes, including liquid reserve accounts, escrow accounts, operating accounts and individual corporate accounts.

122.    A number of the DBSI Companies' accounts, including certain DBSI Inc. accounts, were zero balance accounts ("ZBA"), in that at the end of each day, the monies deposited in those accounts were swept up into an interest bearing liquid reserve account. The accounts held by the TIC property master leasee, Master Leaseco, were typically ZBAs.

123.    To the extent checks or other charges drawn for payment on a ZBA were presented, the ZBA would be reimbursed from one of the DBSI Companies' liquid reserve accounts on an automatic basis. Expenses presented to the ZBAs were monitored so that the liquid reserve accounts could be funded as needed.

124.    The Insiders monitored and managed the DBSI Companies' cash, including DBSI Inc.'s cash, in a globally-consolidated, commingled manner.  If one of the DBSI Companies needed funds to meet operating expenses, purchase property, make payroll, make distributions to Insiders, satisfy third-party debt obligations or meet other cash needs, funds would be transferred from one entity to another where needed, often automatically.  These transactions were not the result of an arm's length transaction between unrelated parties.

125.    The Insiders routinely moved money wherever it was needed without regard for the source of the funds.  The source of funds varied from day to day without regard for where the funds originated.

126.    By late 2006, cash shortages were such an acute problem that management was consumed by the machinations of managing and obtaining cash.  From early 2005, management met frequently to address cash-flow needs.  These meetings were typically attended by Douglas Swenson, Gary Bringhurst, Matthew Duckett or Paris Cole, Thomas Var Reeve, David Swenson and Jeremy Swenson.  Matthew Duckett communicated the decisions made at the cash meetings to the accounting staff so they could execute them.

127.    In preparation for these meetings, a "cash sheet" was prepared that summarized all the sources and uses of cash within the DBSI Companies and projected where cash balances would be over an ensuing 90-day period.  But the focus of the cash meetings was much shorter term because, for a large number of the time periods, despite massive flows of cash in and out of its accounts, a snapshot on any given day would show either a very meager cash balance or a collective deficit.  These meager balances and constant need to feed cash to meet the onerous obligations the DBSI Companies, including DBSI Inc., had incurred required an exceptional

level of attention to maintain liquidity by moving money to wherever and whenever it was needed.

### (2)   Realty Was Insolvent

128.    Realty was insolvent at the times it made the transfers identified on Exhibit B and at other times.  Realty's books and records reflect an entity that was chronically undercapitalized at those and other times.  Realty's balance sheets reflects annual negative entries on the capital stock line for the years 2004 through 2008, aggregating in excess of negative $3.4 million. Repeated negative entries in the capital stock line of an entity's balance sheets are consistent with sustained and prolonged operating losses in excess of cash on hand.  From 2005 through 2008, Realty's capital contribution was either zero or negative.  Moreover, Realty regularly needed cash transfers from DBSI Inc., which was itself insolvent, to cover quarterly losses.

### (3)   ST Tower Was Insolvent

129.    ST Tower was insolvent at the times it made the transfers identified on Exhibit B and at other times, losing $7.9m between 2005 and 2008.  ST Tower was heavily subsidized by DBSI Inc. -- also an insolvent entity -- to fund operating shortfalls.  Those subsidies notwithstanding, ST Tower remained insolvent between 2005 and 2008.

### (4)   Development Was Insolvent

130.    Development was insolvent at the time it made the transfer identified on Exhibit B and at other times, losing $869,827 between 2005 and 2006 and showing negative balances in its capital stock lines during those years.  In addition, in 2007 and 2008 Development's books reflect an entity that was severely undercapitalized by recording receivables on its books as loans from insiders in amounts totaling $6.9 million and $10.5 million respectively.  These loans were made to insolvent entities.  If these loans were adjusted on the balance sheet for collectability –

pursuant to GAAP principles - it would show an insolvent entity.  On the income statement, gross revenues in 2007 and 2008 were sourced solely from DBSI Companies that were deemed to be insolvent and are avoidable transfers that created a false impression of solvency.

**(5)     Telecom Was Insolvent**

131.    Telecom received substantial proceeds from debt and equity investments to develop real property.  The real property did not generate income sufficient to cover Telecom's debt service obligations and, during the time Telecom made the transfer identified on Exhibit B and at other times, Telecom had liabilities exceeding its assets.

**(6)     2007 LID Was Insolvent**

132.    2007 LID was insolvent at the time it made the transfer identified on Exhibit B and at other times, losing in excess of $1.3 million from its inception in 2007 through 2008.  In addition, in 2007 and 2008, LIDs assets consisted primarily of illiquid investments in real property and notes receivables from insolvent DBSI Companies that were uncollectible.  If these investments had been adjusted on the balance sheet for collectability it would clearly show an insolvent entity.  Furthermore, 2007 LID relied on new investor proceeds to fund its current obligations.  In the first quarter 2008, 2007 LID investors received funds characterized as a quarterly interest payment but sourced entirely from new money raised from other investors.

## COUNT ONE

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Professional Negligence / Professional Malpractice)**

133.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

134.    There existed an attorney-client relationship between certain DBSI Companies and Foley

135.   Foley, as an attorney to those DBSI Companies, owed professional duties of case to those DBSI Companies.

136.   Foley's conduct fell below the acceptable standard of care and was professionally negligent.  By was of example, Foley was under a duty to provide clear and accurate advice concerning the tax treatment of accountable reserves and to not draft or approve language regarding the nature and uses of the Accountable Reserves that was false or misleading.  Foley also was under a duty to provide reasonably sound advice concerning investment structures. However, Foley drafted and reviewed PPMs and issued tax opinions that were fraught with material misstatements and omissions and which Foley knew or, in the alternative, should have known were materially misleading.  Foley also devised for the DBSI Companies investment structures that it knew were mere artifices.

137.   Furthermore, given its intimate relationship with the Insiders, Foley knew, or should have known, that the economics of the TIC deals, especially the TIC deals structured according to Foley's admittedly flawed designs, were impossible and that a fraud was being committed.  Foley violated its duties by allowing the Insiders to loot from the DBSI Companies and their Investors, by allowing DBSI to amass impossible levels of debt, and by permitting DBSI Inc. to guaranty obligations which it could not fulfill.

138.   Foreseeably, the Debtors relied on the services provided and the representations made by Foley.  The Debtors disseminated Foley's tax opinions to Investors, disseminated the PPMs that Foley drafted and/or reviewed to Investors, treated the Accountable Reserves as liabilities on their financial statements and sold TIC interests to investors through investments structures recommended by Foley that could only cause the Debtors' insolvency to deepen.

139.   As a direct and proximate result, the Debtors were injured when the Insiders dissipated the DBSI Companies' assets with no corresponding benefit to the Debtors, and prolonged the existence of the Debtors and other DBSI Companies for years past the time they ceased to be economically viable so that the Insiders could continue to pay themselves.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Foley for compensatory damages, punitive damages, plus interest, costs of suit, and such other relief as the Court deems just and equitable.

## COUNT TWO

### (By James R. Zazzali as Trustee of the Private Actions Trust)
### (Fraud)

140.   Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

141.   As set forth above in more detail, Foley authored tax opinions and drafted and/or reviewed PPMs which were disseminated to the Assigning Investors and contained statements and/or representations of material fact that were: (i) knowingly false when made; and (ii) made with the intention that Investors would rely on them.

142.   By way of example, Foley misrepresented the nature of the Accountable Reserves and uses to which Accountable Reserves would be put; misrepresented the financial strength of the DBSI Companies guaranteeing the Assigning Investors' investments; failed to adequately disclose to the Assigning Investors the flaws in the investment structures Foley created, of which Foley was admittedly aware; and represented to its own clients that DBSI Company offerings were financially sound in an effort to lure them into the fraud.

143.   Each of the Assigning Investors was ignorant of each material misstatement's falsity and justifiably relied on the material misstatements to their detriment and were injured

thereby.  Indeed, each Assigning Investor affirmed in writing that the Assigning Investor had
received and relied upon the PPMs.

144.    As a direct and proximate result, the Assigning Investors were harmed.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions
Trust, and against Foley for compensatory damages, punitive damages, costs of suit and such
other relief as the Court deems just and equitable.

### COUNT THREE

**(By James R. Zazzali as Trustee of the Estate Litigation Trust and by James R. Zazzali as
Trustee of the Private Actions Trust)
(Securities Fraud, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, Idaho Code Ann. § 30-14-501)**

145.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set
forth herein at length.  The material misrepresentations and omissions identified above occurred
in connection with the sale of securities, as identified in further detail above.

146.    The material misrepresentations and omissions identified above were contained in
and concerned PPMs and tax opinion letters that were drafted and/or approved by Foley.  Upon
information and belief, Foley knew that the PPMs it drafted and/or approved and tax letters it
issued were materially misleading and allowed them to be issued anyway.

147.    In addition, the conduct set forth above including, without limitation, the land
option and ground lease structures devised by Foley, was a device, artifice and scheme to
defraud the Assigning Investors which operated as a fraud and/or deceit upon the Assigning
Investors in connection with the purchase and sale of the above identified securities.

148.    Foley's conduct including, without limitation, (i) devising and recommending
illusory investment structures, (ii) drafting and approving PPMs and tax opinions letters for those
structures, (iii) failing to adequately disclose critical flaws inherent in those structures of which

Foley was admittedly aware, and (iv) actively marketing investments Foley knew to be financially non-viable, evidenced an intent to deceive, manipulate and defraud.

149.    Foley's conduct as set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Assigning Investors.

150.    The Assigning Investors were ignorant of each of Foley's material misrepresentations and omissions, relied upon them to their detriment and suffered economic loss as a direct and proximate result.

151.    In addition, as a direct and proximate result of Foley's Conduct as set forth above, the Debtors were injured when the Insiders dissipated the DBSI Companies' assets with no corresponding benefit to the Debtors, and prolonged the existence of the Debtors and other DBSI Companies for years past the time they ceased to be economically viable so that the Insiders could continue to pay themselves from funds invested by the Assigning Investors.

152.    As such, Foley violated Idaho Code Ann. § 30-14-501, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5, and in so doing, intended to and did, in fact, injure the Debtors and Assigning Investors in their business and property.

## COUNT FOUR

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Aiding & Abetting Breach of Fiduciary Duty)**

153.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

154.    As directors and officers of the Debtors, each of the Insiders owed the Debtors fiduciary duties of due care, good faith and loyalty.

155.    The above described actions and omissions of the Insiders, including, without limitation, causing the Debtors to issue materially misleading statements to Investors; looting Investor and Debtor funds; putting those funds to other unauthorized use; and causing the Debtors to offer investments that were inherently losing propositions for the Debtors, were grossly negligent, a gross abuse of discretion, and recklessly indifferent to or in deliberate disregard of the interests of the Debtors and were outside the bounds of reason.

156.    The above described actions and omissions were also part of a sustained and systematic failure by the Insiders to exercise proper oversight for the benefit of the Debtors.

157.    The above described actions and omissions also constituted a gross dereliction of duty and a conscious disregard for the Insiders' duties as officers and directors.

158.    Accordingly, the Insiders have breached their fiduciary duties to the Debtors.

159.    Through Foley's above described course of conduct including, without limitation, drafting and approving misleading PPMs; issuing misleading tax opinions; creating and recommending inherently flawed investment structures; and directly marketing the Debtors' losing investments to its own clients, Foley knowingly and substantially participated in the aforementioned breaches of fiduciary duty by the Insiders.

160.    As a direct and proximate result, the Debtors have been damaged when the Insiders, with the conscious assistance and involvement of Foley, dissipated the DBSI Companies' assets with no corresponding benefit to the Debtors, and prolonged the existence of the Debtors and other DBSI Companies for years past the time they ceased to be economically viable so that the Insiders could continue to pay themselves.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate

Litigation Trust, and against Foley for compensatory damages, punitive damages, costs of suit

and such other relief as the Court deems just and equitable.

## COUNT FIVE

### (By James R. Zazzali as Trustee of the Private Actions Trust)
### (Aiding and Abetting Fraud)

161.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set

forth herein at length.

162.    As set forth above in more detail, each of the material misstatements and

omissions identified above made, authorized and/or directed by the Insiders including, without

limitation, that Accountable Reserves would be used for purposes unrelated to the purchase price

of TIC interests; that Accountable Reserves would not be commingled with funds from any other

source; that the DBSI Companies were financially strong and capable of satisfying their

obligations to Assigning Investors; and the Insiders' failure to disclose the flaws inherent in the

master lease, land option and ground lease structures were (i) statements, representations or

omissions of material fact, (ii) knowingly false when made, and (iii) made with the intention that

Investors would rely upon them.

163.    Each of the Assigning Investors was ignorant of each material misstatement's

falsity and justifiably relied on the material misstatements to their detriment and were injured

thereby.  For example, each Assigning Investor affirmed in writing that the Assigning Investor

had read and relied upon the PPMs in deciding to invest.

164.    As set forth in greater detail above, Foley knew of the material misstatements and

omissions made by the Insiders in materials distributed to Investors.  For example, upon

information and belief, Foley knew that Accountable Reserves were commingled with funds

from other sources yet drafted and/or approved language expressly stating the opposite; issued

tax opinions supporting the Insiders' misrepresentations concerning the nature and uses of the

Accountable Reserves; created and recommended the use of inherently flawed investment

structures and reviewed and/or drafted PPMs that did not adequately disclose to Investors the

flaws inherent in those structures; and actively marketed to its own clients the DBSI Companies'

offerings Foley knew were doomed to fail.  As a result, Foley knowingly and substantially

participated in the frauds committed by the Insiders.

165.    As a direct and proximate result, the Assigning Investors were harmed when the

Insiders, with the conscious assistance and involvement of Foley, ignored the interests of the

Investors, dissipated the DBSI Companies' assets with no corresponding benefit to the DBSI

Companies, and prolonged the existence of the DBSI Companies for years past the time they

became economically non-viable so that the Insiders could bilk the Assigning Investors of

hundreds of millions of dollars.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions

Trust, and against Foley for compensatory damages, punitive damages, costs of suit and such

other relief as the Court deems just and equitable.

## COUNT SIX

### (By James R. Zazzali as Trustee of the Private Actions Trust)
### (Civil Conspiracy)

166.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set

forth herein at length.

167.    The wrongs alleged herein were the product of agreements among or a

confederation among the Insiders and Foley during a period beginning no later than 2005

through in or about 2008 with the common objective of accomplishing the wrongs alleged,

including, but not limited to, misleading Investors.  The existence of that agreement can be inferred from, among other things, Foley's intimate familiarity with the internal operations of the DBSI Companies and the fact that Foley devised inherently flawed investment structures at the Insiders' request; drafted and approved PPMs that failed to adequately disclose the flaws inherent in those structures and obscured the uses to which investor funds were to be put; and actively marketed investments to its own clients that Foley knew were doomed to fail.

168.    As detailed above, the Insiders and Foley used unlawful means to accomplish their wrongful objectives, including, without limitation, fraud, breach of fiduciary duty and breach of trust.

169.    The Assigning Investors were injured when the Insiders, with the conscious assistance and involvement of Foley, ignored the interests of the Investors, dissipated the DBSI Companies' assets with no corresponding benefit to the DBSI Companies, and prolonged the existence of the DBSI Companies for years past the time they became economically non-viable so that the Insiders could bilk the Assigning Investors of hundreds of millions of dollars.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Foley for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT SEVEN

### (By James R. Zazzali as Trustee of the Private Actions Trust)
### (Aiding and Abetting Breach of Fiduciary Duty/Breach of Trust)

170.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

171.    The Insiders were *de facto* trustees of the Accountable Reserves funds deposited with the DBSI Companies by the TIC Investors.

172.     As trustees, the Insiders owed fiduciary duties of care, good faith and loyalty to the TIC Investors.

173.     The above described actions and omissions by the Insiders, including, without limitation, the unauthorized use and looting of the Accountable Reserves, were grossly negligent, a gross abuse of discretion, and recklessly indifferent to or in deliberate disregard of the interests of the TIC Investors and were outside the bounds of reason.

174.     The above described actions and omissions by the Insiders also constituted unfair self-dealing, the unfair elevation of their personal interests above those of the TIC Investors, and the unfair pursuit and receipt of personal benefits at the expense of the TIC Investors.

175.     The above described actions and omissions were also part of a sustained and systematic failure by the Insiders to exercise proper oversight over the Accountable Reserves for the benefit of the TIC Investors.

176.     The above described actions and omissions also constituted a gross dereliction of duty and a conscious disregard for the Insiders' duties as trustees.

177.     Accordingly, the Insiders have breached their fiduciary duties to the TIC Investors.

178.     Foley, by drafting and approving language concerning the nature and uses of the Accountable Reserves that it knew to be false and issuing tax opinions it knew to be misleading, knowingly and substantially participated in the aforementioned breaches of fiduciary duty by the Insiders.

179.     As a direct and proximate result, the TIC Investors, including certain Assigning Investors, were damaged when the Insiders, with the conscious assistance and involvement of Foley, ignored the interests of the Investors, dissipated the DBSI Companies' assets with no

corresponding benefit to the DBSI Companies, and prolonged the existence of the DBSI Companies for years past the time they became economically non-viable so that the Insiders could bilk the Assigning Investors of hundreds of millions of dollars.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Foley for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT EIGHT

**(By James R. Zazzali as Trustee of the Private Actions Trust)**
**(Aiding and Abetting Breach of Fiduciary Duty)**

180.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

181.    At times relevant to this Complaint, the Debtors and the other DBSI Companies were insolvent.

182.    As directors and officers of the insolvent DBSI Companies and Debtors, each of the Insiders owed the creditors of such insolvent DBSI Companies and Debtors fiduciary duties of due care, good faith and loyalty.

183.    The above described actions and omissions of the Insiders including, without limitation, the looting and misuse of Investors' and Debtors' funds and the offering of investments that could only work to deepen the Debtors' insolvency, were grossly negligent, a gross abuse of discretion, and recklessly indifferent to or in deliberate disregard of the interests of the creditors and were outside the bounds of reason.

184.    The above described actions and omissions were also part of a sustained and systematic failure by the Insiders to exercise proper oversight for the benefit of the creditors.

185.    The above described actions and omissions also constituted a gross dereliction of duty and a conscious disregard for the Insiders' duties as officers and directors.

186.    Accordingly, the Insiders have breached their fiduciary duties to the Investors.

187.    Through Foley's above described course of conduct including, without limitation, creating and recommending inherently flawed investment structures, drafting and/or approving PPM language and issuing tax opinions intended to obscure and perpetuate the Insiders' fraud, and actively attempting to lure additional investors into the fraudulent scheme, Foley knowingly and substantially participated in the aforementioned breaches of fiduciary duty by the Insiders.

188.    As a direct and proximate result, the Assigning Investors were damaged when the Insiders, with the conscious assistance and involvement of Foley, ignored the interests of the Investors, dissipated the DBSI Companies' assets with no corresponding benefit to the Debtors, and prolonged the existence of the Debtors and other DBSI Companies for years past the time they became economically non-viable so that the Insiders could bilk the Assigning Investors of hundreds of millions of dollars.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Foley for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT NINE

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Avoidance and Recovery of the Two Year Transfers as Actual Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551)**

189.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

190.    The Two Year Transfers were made with the Debtors' actual intent to hinder, delay, or defraud creditors of the Transferors because the Two Year Transfers were made in connection with and in furtherance of the Debtors' on-going fraudulent scheme.

191.    The Transferors knew of the Debtors' dependence on new investor money to provide cash for operations and to fund payments to prior Investors.

192.    The Transferors knew:  (i) that the Transferors' assets were impaired; (ii) that the Transferors failed to record appropriate reserves for such impairment; and (iii) that their assets were therefore overvalued.

193.    The Transferors knew that their real property portfolio barely broke even or lost money because the income from the properties was insufficient to cover the combined burdens of debt service and guaranteed TIC investor payments.

194.    As of the date hereof, Defendants have not returned any of the Two Year Transfers to the Debtors' estates.

Wherefore, as a result of the foregoing, Plaintiff is entitled to a judgment pursuant to sections 548(a)(1)(A), 550, and 551 of the Bankruptcy Code:  (i) avoiding and preserving the Two Year Transfers; (ii) directing that the Two Year Transfers be set aside; and (iii) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the Debtors' estates.

## COUNT TEN

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a) and 551)**

195.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

196.    The Transferors were:  (i) insolvent when the Two Year Transfers were made, or, in the alternative, became insolvent as a result of the Two Year Transfers; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which the property remaining with the Transferors after the Two Year Transfers were made constituted unreasonably small capital; or, alternatively, (iii) at the time the Two Year Transfers were made, the Transferors intended to incur, or believed that they would incur, debts that would be beyond the Transferors' ability to pay as they matured.

197.    The Transferors received less than reasonably equivalent value in exchange for the Two Year Transfers.

198.    Defendants are either the initial transferee of the Two Year Transfers or the immediate or mediate transferee of such initial transferee or are the persons for whose benefit the Two Year Transfers were made.

199.    As of the date hereof, Defendants have not returned any of the Two Year Transfers to the Debtors' estates.

Wherefore, as a result of the foregoing, Plaintiff is entitled to a judgment pursuant to sections 548(a)(1)(B), 550, and 551 of the Bankruptcy Code:  (i) avoiding and preserving the Two Year Transfers; (ii) directing that the Two Year Transfers be set aside; and (iii) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the Debtors' estates.

## COUNT ELEVEN

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Avoidance and Recovery of the Four Year Transfers as Actual Fraudulent**
**Transfers Pursuant to Idaho Code §§ 55-913(1)(a), 55-916, and 55-917)**

200.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

201.    The Four Year Transfers were made with the Debtors' actual intent to hinder, delay, or defraud creditors of the Transferors because the Four Year Transfers were made in connection with and in furtherance of the Debtors' on-going fraudulent scheme.

202.    The Transferors knew that their real property portfolio barely broke even or lost money because the income from the properties was insufficient to cover the combined burdens of debt service and guaranteed TIC investor payments.

203.    The Transferors knew that their management was closely monitoring the Debtors' cash needs and that certain members of senior management and various accounting personnel were meeting weekly to review the cash obligations of the DBSI enterprise and identifying sources and uses of cash to meet near-term funding requirements.

204.    The Transferors knew of the Debtors' dependence on new investor money to provide cash for its operations and to fund payments to prior Investors.

205.    The Transferors knew:  (i) that the Transferors' assets were impaired; (ii) that the Transferors failed to record appropriate reserves for such impairment; and (iii) that their assets were therefore overvalued.

206.    The Four Year Transfers were fraudulent transfers in violation of Idaho Code Ann. §§ 55-913(1)(a), 55-916, and 55-917.

207.    As of the date hereof, Defendants have not returned any of the Four Year Transfers to the Debtors' estates.

Wherefore, as a result of the foregoing, Plaintiff is entitled to a judgment pursuant to Idaho Code Ann. §§ 55-913(1)(a), 55-916, and 55-917 and Bankruptcy Code §§ 544(b), 550, and 551:  (i) avoiding and preserving the Four Year Transfers; (ii) directing that the Four Year Transfers be set aside; and (iii) recovering the Four Year Transfers, or the value thereof, from Foley for the benefit of the Debtors' estates.

### COUNT TWELVE

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Avoidance and Recovery of the Four Year Transfers as Constructively Fraudulent Transfers Pursuant to Idaho Code §§ 55-913(1)(B), 55-916, and 55-917 and 11 U.S.C. §§ 544(B), 550, and 551)**

208.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

209.    The Transferors were insolvent as that term is defined under Idaho Code Ann. § 55-912 during the Four Year Period.

210.    The Transferors received less than reasonably equivalent value in exchange for the Four Year Transfers.

211.    The Four Year Transfers were made while the Transferors were engaged, or were about to engage, in a business or a transaction for which the Transferors' remaining assets were unreasonably small in relation to their businesses or transactions.

212.    The Transferors reasonably should have believed that they would incur debts beyond their ability to pay as they became due as a result of the Four Year Transfers.

213.    Certain of the Investors are unsecured creditors that existed at the time of or after the Four Year Transfers who hold claims that are allowable under Bankruptcy Code section 502 and who, under non-bankruptcy law, could have avoided the Four Year Transfers, at least in part.

214.    The Four Year Transfers were fraudulent transfers in violation of Idaho Code Ann. § 55-913(1)(b) as to present and future creditors.

215.    Defendants are either the initial transferee of the Four Year Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Four Year Transfers were made.

216.    As of the date hereof, Defendants have not returned any of the Four Year Transfers to the Debtors' estates.

Wherefore, as a result of the foregoing, Plaintiff is entitled to a judgment pursuant to Idaho Code Ann. §§ 55-913(1)(b), 55-916, and 55-917 and Bankruptcy Code §§ 544(b), 550, and 551:  (i) avoiding and preserving the Four Year Transfers; (ii) directing that the Four Year Transfers be set aside; and (iii) recovering the Four Year Transfers, or the value thereof, from Defendant for the benefit of the Debtors' estates.

## COUNT THIRTEEN

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Avoidance and Recovery of the Four Year Transfers as Constructively Fraudulent Transfers Pursuant to Idaho Code §§ 55-914(1), 55-916, and 55-917 and 11 U.S.C. §§ 544(B), 550, and 551)**

217.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

218.    The Transferors were insolvent as that term is defined under Idaho Code Ann. § 55-912 during the Four Year Period and at the time the Four Year Transfers were made or became insolvent as a result of the Four Year Transfers.

219.    The Four Year Transfers were made by the Transferors without receiving reasonably equivalent value in exchange for the transfers or obligations.

220.    Certain of the Investors are unsecured creditors that existed at the time of the Four

Year Transfers who hold claims that are allowable under Bankruptcy Code section 502 and who,

under non-bankruptcy law, could have avoided the transfers, at least in part.

221.    The Four Year Transfers were fraudulent transfers in violation of Idaho Code

Ann. § 55-914(1).

222.    Defendants are the initial transferee of the Four Year Transfers or the immediate

or mediate transferee of such initial transferee or the person for whose benefit the Four Year

Transfers were made.

223.    As of the date hereof, Defendants have not returned any of the Four Year

Transfers to the Debtors' estates.

Wherefore, as a result of the foregoing, Plaintiff is entitled to a judgment pursuant to

Idaho Code Ann. §§ 55-914(1), 55-916 and 55-917 and Bankruptcy Code §§ 544(b), 550, and

551:  (i) avoiding and preserving the Four Year Transfers; (ii) directing that the Four Year

Transfers be set aside; and (iii) recovering the Four Year Transfers, or the value thereof, from

Defendants for the benefit of the Debtors' estates.

## COUNT FOURTEEN

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Transfers in Fraud of Creditors Pursuant to Idaho Code § 55-906 and 11 U.S.C. §§ 544(b), 550, and 551)**

224.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set

forth herein at length.

225.    Idaho Code Ann. § 55-906 provides that:

> Every transfer of property, or charge thereon made, every
> obligation incurred, and every judicial proceeding taken, with
> intent to delay or defraud any creditor or other person of his
> demand, is void against all creditors of the debtor and their
> successors in interest, and against any person upon whom the

estate of the debtor devolves in trust for the benefit of others than the debtor.

226.    The Transferors knew that their real property portfolio barely broke even or lost money because the income from the properties was insufficient to cover the combined burdens of debt service and guaranteed TIC Investor payments.

227.    The Transferors knew that their management was closely monitoring the Debtors' cash needs and that certain members of senior management and various accounting personnel were meeting weekly to review the cash obligations of the DBSI enterprise and identifying sources and uses of cash to meet near-term funding requirements.

228.    The Transferors knew of the Debtors' dependence on new investor money to provide cash for its operations and to fund payments to prior Investors.

229.    The Four Year Transfers were made with the actual intent to hinder, delay, or defraud creditors of the Transferors because the Four Year Transfers were made in connection with and in furtherance of the Debtors' on-going fraudulent scheme.

230.    The Transferors knew:  (i) that the Transferors' assets were impaired; (ii) that the Transferors failed to record appropriate reserves for such impairment; and (iii) that the assets were therefore overvalued.

231.    The Transferors knew that at the time the Four Year Transfers were made that the Transferors were insolvent.

232.    The Four Year Transfers were made in violation of Idaho Code Ann. § 55-906.

233.    As of the date hereof, Defendants have not returned any of the Four Year Transfers to the Debtors' estates.

Wherefore, as a result of the foregoing, Plaintiff is entitled to a judgment pursuant to Idaho Code Ann. §§ 55-906 and Bankruptcy Code §§ 544(b), 550, and 551:  (i) avoiding and

preserving the Four Year Transfers; (ii) directing that the Four Year Transfers be set aside; and

(iii) recovering the Four Year Transfers, or the value thereof, from Defendants for the benefit of

the Debtors' estates.

## COUNT FIFTEEN

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Preferential Transfers Pursuant to 11 U.S.C. §§ 547, 550, and 551)**

234.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set

forth herein at length.

235.    Upon information and belief, during the Preference Period, the Debtors continued

to operate their business affairs, including the transfer of property either by checks, cashiers

checks, wire transfers, or otherwise to certain transferees, including Defendants.

236.    Plaintiff is seeking to avoid all of the preferential transfers made by the

Transferors to Defendants during the Preference Period.

237.    Within the Preference Period, the Transferors made one or more Preferential

Transfers.

238.    Defendants were creditors (within the meaning of section 101(10) of the

Bankruptcy Code) of one or more of the Debtors at the time the Preferential Transfers were

made, or were acting on behalf of John Does 1-50 or ABC Entities 1-50 in receiving the

Preferential Transfers

239.    At the time of each of the Preferential Transfers, Defendants had a right to

payment on account of one or more antecedent debts owed by one or more of the Debtors to

Foley, John Does 1-50 and/or ABC Entities 1-50.

240.     The Preferential Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because the Preferential Transfers either reduced or fully satisfied an antecedent debt then owed by one or more of the Debtors to Defendants.

241.     The Transferors were insolvent at all times during the Preference Period.  Plaintiff is entitled to a presumption of insolvency during the Preference Period for the Preferential Transfers pursuant to section 547(f) of the Bankruptcy Code.

242.     As a result of the Preferential Transfers, Defendants received more than they would have received if: (i) the Debtors' cases were administered under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Defendants received payment of their respective debts to the extent provided by the provisions of the Bankruptcy Code.

243.     Foley, John Does 1-50 and/or ABC Entities 1-50 are either the initial transferee of the Preferential Transfers or the immediate or mediate transferees of such initial transferee or are the persons for whose benefit the Preferential Transfers were made.

244.     As of the date hereof, Foley, John Does 1-50 and/or ABC Entities 1-50 have not returned any of the Preferential Transfers to the Debtors' estates.

Wherefore, as a result of the foregoing, pursuant to section 547(b), 550, and 551 of the Bankruptcy Code, Plaintiff is entitled to a judgment: (i) avoiding and preserving the Preferential Transfers; (ii) directing that the Preferential Transfers be set aside; and (iii) recovering the Preferential Transfers, or the value thereof, from Foley, John Does 1-50 and/or ABC Entities 1-50 for the benefit of the Debtors' estates.

## COUNT SIXTEEN

**(By James R. Zazzali as Trustee of the Estate Litigation Trust)**
**(Unjust Enrichment)**

245.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

246.    Defendants were enriched as a result of receiving the Two Year Transfers and the Four Year Transfers described in this Complaint by receiving something of value that belonged to Plaintiff.

247.    These enrichments violate equity and good conscience.

248.    These enrichments did not result from enforceable agreements between Plaintiff and Defendants.

Wherefore, as a result of the foregoing, Plaintiff is entitled to a judgment compelling Defendants to make restitution to Plaintiff in the amount of the Two Year Transfers and the Four Year Transfers.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury as to all issues so triable.

Dated:  October 31, 2011
        Wilmington, Delaware

                                             **GIBBONS P.C.**

                                             By: /s/ Natasha M. Songonuga
                                           Natasha M. Songonuga, Esq. (Bar No. 5391)
                                           1000 N. West Street, Suite 1200
                                         Wilmington, DE  19801-1058
                                         Telephone:  (302) 295-4875
                                         Facsimile:  (302) 295-4876
                                         E-mail: nsongonuga@gibbonslaw.com

                                           Of Counsel:

                                           Brian J. McMahon, Esq.
                                           E. Evans Wohlforth, Jr., Esq.

                                           *Counsel to James R. Zazzali, Trustee*
                                           *of the DBSI Estate Litigation Trust and the*
                                           *DBSI Private Actions Trust*